*Attorney Grievance Commission v. Roger N. Powell*, Misc. Docket AG No. 9, September Term, 2017.  Opinion by Getty, J.

**ATTORNEY DISCIPLINE — SANCTIONS — DISBARMENT —** The Court of Appeals disbarred an attorney who failed to submit timely, completed, and accurate inventory of estate assets and administrative account of the estate, failed to submit a petition for personal representative's commissions and attorney's fees before disbursing fees to himself and the personal representative, and, after the issuance of Orphans' Court orders to do so, failed to return estate funds.  Additionally, the attorney filed a lawsuit against the previous personal representative of the estate, which the circuit court and the Court of Special Appeals ruled was without substantial justification.  Lastly, the attorney failed to properly manage his trust accounts.  There was clear and convincing evidence of commingling, use of the accounts for personal matters, and failure to keep complete records.

These actions violated the Maryland Lawyers' Rules of Professional Conduct Rules 1.1 (Competence), 1.3 (Diligence), 1.5(a) (Fees), 1.7 (Conflict of Interest) 1.15(a) (Safekeeping Property), 3.1(a) (Meritorious Claims and Contentions), 3.3(a) (Candor Toward the Tribunal), 3.4(c) (Fairness to Opposing Party and Attorney), 4.4 (Respect for Rights of Third Persons), 8.1(b) (Bar Admission and Disciplinary Matters), and 8.4(a), (c), and (d) (Misconduct), and Maryland Rules 19-407, 19-408, and 19-410 (formerly Maryland Rules 16-606.1, 16-607, and 16-609).

Circuit Court for Baltimore City
Case No.: 24-C-17-003207/AG
Argued: June 1, 2018

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 9

September Term, 2017

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

ROGER N. POWELL

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Getty, J.

_____

Filed: August 28, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

This attorney discipline case involves an attorney who represented the personal representative of an estate. While representing his client, the attorney failed to submit a timely, complete, and accurate inventory of estate assets and an administrative account of the estate. The attorney also failed to submit a petition for personal representative's commissions and attorney's fees before disbursing fees and commissions to himself and the personal representative. Even after the Orphans' Court ordered him to return the estate funds, the attorney did not. Additionally, the attorney filed a lawsuit against a previous personal representative of the estate which the circuit court and the Court of Special Appeals determined was without substantial justification. Lastly, the attorney failed to properly manage his trust accounts, using the accounts for personal matters, and failed to retain complete records.

On May 5, 2017, the Attorney Grievance Commission of Maryland ("Bar Counsel") filed a Petition for Disciplinary or Remedial Action ("Petition") alleging that Roger N. Powell ("Powell") had violated the Maryland Lawyers' Rules of Professional Conduct ("Rules").[1] The Petition alleged that Powell, during representation of Charles Wingler in the administration of Charlene Wingler's estate ("the Estate" or "decedent's Estate") and otherwise, violated the following Rules: 1.1 (Competence); 1.3 (Diligence); 1.4

---

[1] Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and recodified in Title 19 of the Maryland Rules. Since Powell's misconduct occurred before and after the effective date of the recodification of the rules of professional conduct, he committed violations of the same rules of professional conduct under both the MLRPC and the MARPC. For simplicity, and because there is no substantive difference in the two codifications of the rules, we shall use the shorter designations of the MLRPC, *e.g.*, "Rule 1.1."

(Communication); 1.5 (Fees); 1.7 (Conflict of Interest); 1.8 (Conflict of Interest); 1.15 (Safekeeping Property); 3.1 (Meritorious Claims and Contentions); 3.3 (Candor Toward the Tribunal); 3.4 (Fairness to Opposing Party and Attorney); 4.4 (Respect for Rights of Third Persons); 8.1 (Bar Admission and Disciplinary Matter); and 8.4 (Misconduct).[2] The Petition also alleged that Powell violated Maryland Rules 16-603 (Duty to Maintain Account), 16-606.1 (Attorney Trust Account Record-Keeping), 16-607 (Commingling of Funds), and 16-609 (Prohibited Transactions).[3]

By Order dated June 6, 2017, we designated Judge Philip S. Jackson ("the hearing judge") of the Circuit Court for Baltimore City to conduct a hearing concerning the alleged violations and to provide findings of fact and recommended conclusions of law. *See* Maryland Rule 19-722(a). The hearing took place over the course of September 27-29, 2017 ("evidentiary hearing"). At the evidentiary hearing, Bar Counsel introduced into evidence various exhibits, including documents relating to the Estate and to Powell's attorney trust accounts. Several witnesses, including E. Suzan Miller, Charles Miller, Charles Wingler, Jean Wingler, and Powell, testified.

After the evidentiary hearing concluded, the hearing judge requested that the parties submit proposed findings of facts and conclusions of law. Bar Counsel submitted a memorandum within the period specified by the hearing judge. The hearing judge then

---

[2] Bar Counsel later withdrew its Rule 1.4 violation allegation.

[3] Effective July 1, 2016, these rules on attorney trust accounts were recodified as Maryland Rules 19-403, 19-407, 19-408, and 19-410, respectively. We will refer to the present Maryland Rules in our analysis.

submitted his findings of facts and conclusions of law opinion to this Court on January 10, 2018. On January 17, 2018, Powell filed a motion to remand with this Court that alleged that he submitted a legal memorandum to the hearing judge at the close of evidence that was not considered by the hearing judge. We granted Powell's motion and referred the matter back to the hearing judge to consider Powell's memorandum. The hearing judge then issued an updated opinion on March 30, 2018. In his recommended conclusions of law, the hearing judge found that Powell violated Rules 1.1, 1.3, 1.5(a), 1.7, 1.15(a), 3.1(a), 3.3(a), 3.4(c), 4.4, 8.1(b) and 8.4(a) and (c). The hearing judge also concluded that Powell violated Maryland Rules 16-606.1, 16-707, and 16-609.

Both parties filed exceptions to the hearing judge's findings of fact and recommended conclusions of law. On June 1, 2018, we heard oral argument in this matter. The same day, we issued a *per curiam* order disbarring Powell. We now explain our reasons for imposing the sanction of disbarment.

## BACKGROUND

Powell was admitted to the Bar of Maryland in June 1971 and has maintained a law office in either Baltimore City or Baltimore County since his admission.

This matter involves two instances of alleged misconduct stemming from: (a) a complaint filed by E. Suzan Miller, Esq. ("Attorney Miller"), pertaining to Powell's conduct during the administration of the Estate; and, (b) Powell's management of his attorney trust accounts generally. We summarize the hearing judge's factual findings below.

*The Will and the Administration of the Estate*

3

In 2004, Charlene Wingler ("the decedent") handwrote a document titled "Charlene Denise Wingler's final wishes" (the "will"). In this will, the decedent appointed her long-time friend, Stephanie Wilking ("Wilking"), as the personal representative of the Estate and as beneficiary to care for her pets and house with the proceeds of the Estate. Additionally, the will gifted personal property and $20,000 to her brother, Charles Wingler, and $5,000 to his wife. Although the will was required to be signed by the decedent and witnessed by two individuals, only one witness signed the document. The will included a list of the decedent's assets, including her bank, retirement, and investment accounts and life insurance policies.

On January 8, 2011, Charlene Wingler died. Attorney Miller began representation of Wilking in matters related to the Estate following Charlene Wingler's death. Although she had concerns about the validity of the handwritten will due to the lack of two witness signatures, Attorney Miller filed the will along with other necessary documents based upon a conversation she had with an assistant Register of Wills. Included in these documents were proofs of execution of the will completed by two witnesses although only one signed the will. The will was admitted for administrative probate on April 1, 2011, and Wilking was appointed personal representative of the Estate.

During June 2011, Charles Wingler contacted Attorney Miller and told her that he had received the Estate documents she had sent and that he had moved from Hampstead to Ocean City, Maryland. Attorney Miller apprised the Orphans' Court for Carroll County ("Orphans' Court") of this information. Charles Wingler also stated he was not interested in becoming the personal representative of the Estate and that he had personal property

4

stored in an outbuilding located on the decedent's property that he needed to collect. Since there was also property in the outbuilding that belonged to one of the decedent's friends, Wilking wanted to be present when Charles Wingler came to claim his property. Charles Wingler agreed to coordinate a time with Wilking to retrieve his property but never did. Instead, he went to the decedent's real property when Wilking was not present and was unable to collect his personal belongings. In September 2011, Attorney Miller sent Charles Wingler a letter informing him that if he did not make arrangements during September, the property would be considered abandoned. Charles Wingler did not make arrangements to claim his property during September.

No interested parties, including Charles Wingler, challenged the will and therefore, the Estate was administered for approximately one year consistent with the terms of the will. As personal representative, Wilking opened a bank account for the Estate and made expenditures, including care for the decedent's pets, payment of the decedent's debts, and repairs to the residential real property in preparation for its listing for sale.

The decedent's retirement accounts were deposited with Fidelity Investments ("Fidelity"). The decedent's Fidelity accounts totaled $127,517.41. Around April 2011, Fidelity notified Wilking that there had been no beneficiary designated in the accounts and the retirement funds were paid to the Estate. However, on September 19, 2011, Fidelity sent a letter to Wilking alerting her that a recordkeeping mistake had been made by Fidelity and that Wilking was the beneficiary of the retirement accounts. Wilking, as personal representative, returned the funds from the Estate to Fidelity and the funds were then sent to Wilking in her individual capacity as the rightful beneficiary.

5

In the inventory filed on June 6, 2011, Attorney Miller and Wilking recorded the full value of the Fidelity funds and the decedent's value of real property at $320,700. This value was based upon the State Department of Assessments and Taxation's tax assessment value as of July 1, 2011, which Attorney Miller testified was customary to use for estate purposes.

On January 3, 2012, Attorney Miller and Wilking filed an amended inventory and an administration account. It reported the decreased value of the Estate assets due to Wilking being named the beneficiary on the Fidelity retirement accounts. Wilking also reported a decrease in the real property value based upon an appraisal by Bitzel & Associates, Inc. that concluded that the value of the dilapidated property was $130,000 and that extensive repairs were required to bring it into suitable condition for sale. A copy of the October 31, 2011 appraisal, which noted that the real estate needed a "gut remodel," and photographs of the squalid condition of the interior of the property were included in the amended inventory.

As such, Wilking used Estate assets to pay the mortgage on the real property and to prepare the property for sale. However, the transfer of $127,517.41 in retirement funds from the Estate to Fidelity, and then to Wilking, had depleted the Estate account, leaving it with insufficient funds to make the necessary repairs. After informing the Orphans' Court, Wilking offered to purchase the property from the Estate at the reduced inventory value. On January 30, 2012, the Orphans' Court sent Charles Wingler an order approving the account subject to exceptions being filed within 20 days. No exceptions were filed.

6

Also in January 2012, Attorney Miller received a call from the same assistant Register of Wills whom she spoke with a year earlier, alerting her that the earlier information imparted about the validity of the will was mistaken. With the will's validity now in question, Attorney Miller filed a petition to accept the will for administrative probate. After conducting a hearing on March 26, 2012, the Orphans' Court ordered that the will be withdrawn due to the lack of two witness signatures, that the Estate proceed intestate, and that Wilking continue as personal representative. Attorney Miller had sent Charles Wingler a copy of the petition, and the Orphans' Court had sent him a copy of the hearing notice. Although he received both mailings, Charles Wingler did not attend the hearing. Since the will was declared invalid, and the Estate was to proceed intestate, Charles Wingler became the sole heir of the decedent's Estate.

*Powell's Representation of Charles Wingler Begins*

After the Orphans' Court declared the will invalid, Charles Wingler met with Powell about his sister's Estate on April 17, 2012. Powell testified that, at this meeting, Charles Wingler told him that he had been rebuffed in his attempts to retrieve his personal property from the decedent's house. According to Powell, Charles Wingler was concerned that much of his sister's Estate "could not be accounted for." Powell entered his appearance on behalf of Charles Wingler in the Estate matter the following day.

Around the same date, Powell contacted Attorney Miller via phone, introduced himself, and requested Estate documents. On approximately April 26, 2012, Powell mailed Attorney Miller two letters. In a May 5, 2012 response letter, Attorney Miller sent Powell a copy of the agreement of sale for the decedent's home, stated that the mortgage company

7

involved was Wells Fargo, and suggested that Powell contact Fidelity regarding information concerning the beneficiary designation. Attorney Miller also indicated that if Charles Wingler wanted to become personal representative or list the house for sale that Wilking would be willing to resign as personal representative and terminate the agreement of sale for the decedent's house. Attorney Miller testified that Wilking was not in good health and that the stress of administering the Estate was an emotional burden.

Instead of agreeing to Wilking's offers, and thus avoiding adversarial proceedings, Powell filed a petition with the Orphans' Court to remove Wilking as personal representative, for an accounting, to attach bond, set aside sale of real estate, and other appropriate relief on May 10, 2012. In the petition, Powell alleged that Wilking first declared the value of the decedent's real estate to be $320,700 and then later changed its value to $130,000. On May 17, 2012, Wilking resigned as personal representative of the Estate and filed a petition for allowance of personal representative's commission. Charles Wingler opposed Wilking's petition for allowance of personal representative's commission.

*Charles Wingler Becomes Personal Representative of the Estate*

At an August 28, 2012 hearing, the Orphans' Court officially removed Wilking as personal representative of the Estate, appointed Charles Wingler as the successor personal representative, and directed Wilking to file a final accounting within thirty days.[4] Also at

---

[4] Wilking filed the final accounting within the deadline which the Orphans' Court approved. Powell and Charles Wingler were sent copies of the accounting and Orphans' Court order and filed no exceptions.

8

this hearing, Powell offered evidence of Wilking's alleged wrongdoing in her handling of the decedent's Estate. Powell presented the testimony of a real estate broker who believed that the property value of the decedent's residence was between $200,000 and $250,000 as of May 2012. The real estate broker also admitted that, in estimating the property's value, he did not go inside the property and that the valuation was based on a projection that the house would be improved.

On October 9, 2012, Powell took control and possession of the decedent's Estate and approved the sale of the real property for $180,000 to a different buyer. By the time the property had been sold, a new roof and new windows had been installed.

Powell then submitted an amended inventory to the Orphans' Court on January 29, 2013. The Orphans' Court found this filing deficient in many ways. The inventory submission provided no documentation supporting the values of the listed Estate property. Instead of listing $180,000 as the sales price of the decedent's real property, Powell wrote "contract for sale of estate . . . Appraiser testified to a higher value before gaining access and finding that kitchen and both bathrooms had been removed." Powell failed to acknowledge that the real property was encumbered by a $110,000 mortgage. Additionally, Powell neglected to list jewelry in the inventory even though Powell later admitted that Wilking turned over a box of jewelry and Powell had it appraised on August 29, 2012. Additionally, a copy of the appraisal was not submitted with the inventory either. According to the inventory submitted by Powell, the net value of the Estate after the sale of real estate was approximately $68,700.

9

Powell also took control over the Estate's funds on approximately October 9, 2012. Instead of depositing the approximately $70,000 in Estate funds into an account in the name of the Estate, Powell deposited the funds into his attorney trust fund account at BB&T Bank ("BB&T"). In October and December 2012, Powell disbursed $29,000 to Charles Wingler through checks titled "Advancement on Estate Distribution" and "Advance on Bequest." Prior to filing an inventory, accounting, or petition for attorney's fees, Powell began issuing checks to himself which included references to the decedent's Estate. Other than a $121 check issued for court costs, the remainder of the Estate assets, approximately $40,000, was disbursed to Powell in checks that specifically referenced work he performed on behalf of the Estate.

*Powell's Lawsuit against Wilking*

Although Charles Wingler had not filed any exceptions to the various Orphans' Court orders throughout the estate administration process, Powell filed a separate civil action in the Circuit Court for Carroll County on February 1, 2013. In this action, Powell, on behalf of Charles Wingler as an individual and as personal representative of the Estate, named Wilking and NGM Insurance Company ("NGM")[5] as defendants. The lawsuit alleged that Wilking engaged in acts of self-serving misconduct and breach of fiduciary duty which caused the Estate to lose $350,000. Attorney Miller, on behalf of Wilking, filed a motion for summary judgment on October 1, 2013. Following a hearing, the circuit court granted summary judgment in favor of Wilking on November 21, 2013.

---

[5] NGM had issued a nominal bond in the Estate as required at the time of Wilking's appointment as personal representative.

Attorney Miller then filed a motion for sanctions against Powell and Charles Wingler on April 4, 2013, alleging that the civil action was brought in bad faith and without substantial justification. The circuit court granted the motion for sanctions, awarding Wilking and NGM approximately $50,000, jointly and severally. Charles Wingler then moved to alter or amend the judgment. In an unreported opinion, the Court of Special Appeals held that the circuit court "was not clearly erroneous in finding that Mr. Wingler lacked substantial justification to bring and maintain this case" and that the circuit court "did not err in awarding costs and fees under Rule 1-341 to Mrs. Wilking and NGM." *Wingler v. Wilking*, No. 1845, Sept. Term, 2015, 2016 WL 6988477, at *7 (Md. Ct. Spec. App. Nov. 29, 2016).

*Powell Fails to Comply with Deadlines*

Following the initiation of the lawsuit against Wilking, Powell filed a notice and request in the Orphans' Court on March 15, 2013 to request additional time before filing an interim account. Specifically, Powell argued that Charles Wingler was obligated to pursue the lawsuit in order to recover estate assets. The Orphans' Court agreed to extend the deadline until September 13, 2013. Notably, Powell's March 15, 2013 filing did not include a request to authorize the payment of attorney's fees.

However, Powell failed to file the administrative account by the September 13, 2013 deadline and the Orphans' Court issued another show cause order on October 15, 2013. Powell responded to this order and requested an extension which was granted, and the deadline was extended until May 6, 2014. Despite the second extension, Powell did not

11

file an administrative account by the May 6, 2014 deadline and on May 20, 2014, the Orphans' Court issued another show cause order.

The Orphans' Court held a hearing on October 7, 2014 to address the missed deadlines. At the hearing, Charles Wingler and Powell consented to Wilking receiving $5,000 as commission for her tenure as personal representative contingent on $5,000 remaining in Estate funds after payment of expenses. That same day, the Orphans' Court issued an order directing Charles Wingler and Powell to file an administrative account by November 7, 2014. In its order, the Orphans' Court explicitly requested that the administrative account detail the necessity of a trip to Florida[6] and that a petition for attorney's fees be filed with the administrative account detailing the amount of Estate money paid to Powell thus far. The Orphans' Court also requested that Powell and Attorney Miller prepare a joint proposed order detailing the payment of fees and commissions associated with the removal of Wilking as personal representative.

Powell filed a petition for attorney's fees and a consent to payment of attorney's fees, signed by Charles Wingler, on approximately October 22, 2014. The petition for attorney's fees listed "Legal fees (see Petition filed October 22, 2014-161 hours $60,375.00 (pending) Fees advances….$40,000.00" and "Litigation expenses see itemization filed

---

[6] During the evidentiary hearing, Powell testified that he was directed by Charles Wingler to travel to Florida in May 2013 to interview Margaret Smith ("Smith") who lived with the decedent at the time of her death. Powell believed Smith could potentially serve as a witness in the civil action. During this visit, Smith gave Powell a tanzanite ring which had purportedly been given to her by the decedent.

12

October 22, 2014….. $1,378.06." The filing fee for the circuit court lawsuit and the costs for the Florida trip were included in this amount.

In a November 4, 2014 letter, Attorney Miller informed the Orphans' Court that Powell was not cooperating in preparing or submitting the joint proposed order detailing the payment of fees for the removal of Wilking as personal representative. Powell neither signed the order prepared by Attorney Miller nor cooperated in the preparation of the proposed joint order, which the Orphans' Court adopted.

By November 25, 2014, Powell had still not complied with the Orphans' Court's October 7, 2014 order to file an administrative account. As such, the Orphans' Court issued a new show cause order on that day directing Powell to comply with the previous order by December 1, 2014. The Orphans' Court also alerted Powell that any petition for attorney's fees would not be considered until Powell complied with the October 7, 2014 order. Powell failed to comply with the extended deadline of December 1, 2014.

Powell filed a first administration account on December 9, 2014, which showed that: the Estate was valued at $71,539.88; Powell had billed the Estate for one hundred and sixty-one hours totaling $60,375; Powell had already collected $40,000 of those legal fees; and Charles Wingler had been advanced approximately $29,000 from the Estate. The Orphans' Court, on December 22, 2014, denied attorney's fees and ordered Powell and Charles Wingler to return the $40,000 and $29,000, respectively, back to the Estate.

Powell then noted an appeal to the Circuit Court for Carroll County. An attorney for the Orphans' Court filed a motion for summary judgment with the circuit court which was granted.

13

On December 13, 2016, the Orphans' Court found that Charles Wingler willfully disregarded court orders, removed him as personal representative, and appointed a successor personal representative, Gary Desper. Powell and Charles Wingler were ordered to turn over the assets and records of the Estate by December 27, 2016. The Orphans' Court also ordered a contempt fine of $6,300 be imposed against Powell and Charles Wingler if the assets were not turned over by December 27, 2016. Powell wrote to Desper on December 16, 2016, stating that it was unlikely that he would turn over the Estate assets and records by the deadline because he would be travelling out of the state. In an exchange of correspondence, Desper noted in a January 24, 2017 letter to Powell that he had still "not received anything from [Powell]." In a January 27, 2017 letter, Powell relayed to Desper that "the [E]state has no assets with the exception of a single ring" and that there were "no assets to 'turnover' to [Desper]." In later correspondence, Powell wrote to Desper on April 12, 2017, stating that the files he maintained for the Estate had been destroyed when a hot water pipe in his office burst. In this letter, Powell also offered to return the tanzanite ring given to him by Smith.

Neither Powell nor Charles Wingler delivered any Estate funds or property to Desper. Additionally, neither Powell nor Charles Wingler provided a complete and accurate accounting of the Estate nor have Wilking's commissions been paid.

*Powell's Management of Attorney Trust Accounts*

Bar Counsel received notice of overdraft transactions in Powell's trust and escrow accounts on February 4, 2016. Charles Miller ("Investigator Miller") was assigned by Bar Counsel to investigate the accounts.

14

The notice received by Bar Counsel stated that on December 16, 2015, three checks totaling over $4,000 were presented to the bank at which time the balance in Powell's attorney trust account was approximately $563. On February 10, 2016, Bar Counsel sent Powell a letter notifying him of the overdraft and requested an explanation for the checks being dishonored. Powell responded to the inquiry on approximately February 24, 2016, stating that BB&T, his attorney trust account's bank, had informed him on an unspecified date that there was a zero balance in the account. Powell asserted that he knew the account did not have a zero balance and believed that BB&T had made a mistake. Having concerns about BB&T, Powell told Bar Counsel that he intended to close his BB&T account and withdraw "the entire balance" except for the $563. Powell stated that he placed the withdrawn funds into an attorney trust account at PNC Bank ("PNC") then reissued the checks dishonored by BB&T. Although he stated that he would close his BB&T account, Powell continued using this account for client-related transactions after this incident.

During Bar Counsel's investigation, Powell provided a sworn statement and financial records. Bar Counsel obtained BB&T and PNC records pursuant to subpoenas, and Investigator Miller provided spreadsheets summarizing the financial activity on the attorney trust accounts. Powell acknowledged that he kept personal funds in both the BB&T and PNC accounts.

Investigator Miller was able to trace the cause of the overdraft to Powell's withdrawal and subsequent deposit of $222,000 from the BB&T account to the PNC

15

account on December 11, 2015.[7] Powell asserted that the PNC account had been inactive for some time because the account was inconvenient for him to use. According to Powell, the balance in the PNC account prior to the $222,000 deposit was solely his own money.

Investigator Miller also summarized the records for the BB&T account from April 30, 2012 to December 31, 2015 and the PNC account from September 2015 to April 2016. While Investigator Miller was able to identify and correspond certain disbursements and deposits, the disbursements and deposits he could not match he labeled as "unknown." At the evidentiary hearing, Powell alleged that the proceeds of the sale of a piece of real property titled in the name of his wife comprised approximately $150,000 of the $222,000 sum. Powell did not indicate that his wife was his client. The $150,000 amount was deposited on October 20, 2015 into the BB&T account. According to Powell's sworn statement, he deposited this sum into his BB&T attorney trust account because he "didn't want to show the money on a general account as income." Powell later clarified that he made the deposit to avoid the scrutiny of the Internal Revenue Service because the money "was not income." Powell later used the $150,000 to acquire a personal annuity.

Investigator Miller detected other transactions made to or from Powell's BB&T account unrelated to client matters. Making multiple deposits, Powell placed money from Elaine Blum, his wife's cousin, into the trust account on behalf of his wife. Powell confirmed that Elaine Blum was not a client. When questioned why he did this, Powell

---

[7] Before withdrawing $222,000 out of his BB&T account, Powell did not review his BB&T account or his law firm's records to determine whether there were any outstanding checks greater than $500. Powell also stated that the amount left in the account, $563, was "arbitrary."

16

answered that "there was no where else to put it at the time without declaring it as income." The deposits were made between March 13, 2014 and December 15, 2014 and totaled $41,000.

Powell provided a ledger to Bar Counsel which identified a December 29, 2015 BB&T deposit in the amount of $2,608 identified as "IRA." Powell, in his sworn statement, stated that this was a required distribution from his Individual Retirement Account. Powell explained that he placed this money in his trust account "so [he] didn't have to have the issues with it looking like income when it wasn't income because it was already my money."

Additionally, Investigator Miller questioned Powell about a June 9, 2014 BB&T deposit in the amount of $3,750 from Jared Bierer. Powell explained that Bierer was not a client but instead was his step-son. Powell stated that these funds were for damage to carpets caused by a malfunctioning washing machine. In his sworn statement, Powell explained: "he was going through a divorce and had issues . . . we wanted to keep [the $3,750] out of the [divorce] case." While Powell provided ledgers documenting the Bierer transactions, there were other account discrepancies including a $500 transaction which had not been deposited and another transaction recorded as $1,000 when it was actually $800.

An additional $10,000 of the $220,000 deposit was credited to client matters identified by Powell which had not been disbursed prior to December 11, 2014. Investigator Miller identified multiple instances, involving clients "Constance Benny," "Audra Bond," and "Bonneville," in which Powell disbursed funds from the trust account

17

prior to depositing funds related to the disbursements. Additionally, Investigator Miller discovered a check written on the BB&T account for which no corresponding client ledger was provided. This $2,375 check was written payable to James J. Farley on February 28, 2014 and referenced "Ivan Benson." Powell never provided a ledger card for a client named Ivan Benson.

Investigator Miller calculated the total amount of the unattributable disbursements made to Powell as $78,108.08. These disbursements took the form of both checks payable to Powell and checks written to cash. Powell asserted that he deposited $10,000 of his own money into the account when it was first opened and that he allowed funds, such as reimbursements for advanced costs, to accumulate in the account as the rationale for approximately $70,000 of the unaccounted balance

During Powell's representation of Charles Wingler, Powell took possession of financial assets of the decedent's Estate, totaling approximately $70,000, and deposited these funds into his BB&T account on approximately October 9, 2012. While Powell did produce a client ledger card labeled "Wingler," it did not include the deposits or disbursements made in 2012 nor did it itemize the amounts disbursed from those funds. Finally, when Investigator Miller asked Powell to provide his trust accounts' monthly reconciliation reports, Powell did not respond.

## Standard of Review

In an attorney discipline proceeding, this Court reviews for clear error a hearing judge's findings of fact, and reviews without deference a hearing judge's conclusions of law. *See* Md. R. 19-741(b)(2)(B) ("The Court [of Appeals] shall give due regard to the

18

opportunity of the hearing judge to assess the credibility of witnesses."); *Attorney Grievance Comm'n v. Chanthunya*, 446 Md. 576, 588 (2016) ("This Court reviews for clear error a hearing judge's findings of fact." (Citations omitted)); Md. R. 19-741(b)(1) ("The Court of Appeals shall review *de novo* the [hearing] judge's conclusions of law."). This Court determines whether clear and convincing evidence establishes that a lawyer violated an MLRPC. *See* Md. R. 19-727(c) ("Bar Counsel has the burden of proving the averments of the petition [for disciplinary or remedial action] by clear and convincing evidence.").

If exceptions to the findings of fact are filed, the Court "shall determine whether the findings of fact have been proved by the requisite standard of proof set out in Rule 19-727(c)." Md. R. 19-741(b)(2)(B); *Attorney Grievance Comm'n v. Mahone*, 435 Md. 84, 104 (2013).

## DISCUSSION

### A. *Exceptions to the Hearing Judge's Findings of Facts*

Bar Counsel does not except to any of the hearing judge's findings of fact. Powell notes several exceptions to the hearing judge's factual findings.

First, Powell excepts to the hearing judge's finding that the Estate "had assets consisting of bank accounts, two (2) different retirement accounts, real estate that had been the Decedent's residence/home, and the personal property contained therein." Without citation or reference to the record, Powell contends that the Estate "also contained three automobiles, jewelry, and additional personal property." The hearing judge's use of "personal property contained therein" clearly intended to include personal property on or

19

within the decedent's real property. The entirety of Powell's stated exception is personal property found on or within the decedent's property. Additionally, the hearing judge specifically refers to automobiles and jewelry when discussing Estate assets later in the findings of facts. The hearing judge did not commit clear error, and the exception is overruled.

Similarly, Powell excepts to the hearing judge's finding that the amended inventory was "detailed, itemized and supported by documentation." Powell asserts that this is incorrect because the amended inventory "failed to note the existence of any jewelry or the value of any vehicles." In support, Powell points to Charles Wingler's testimony that Wilking gave him a "small box of jewelry" and that the decedent "had substantially more jewelry" and "owned three cars at the time of her death." Additionally, Powell states that he testified "as to the existence of a diamond/tanzanite ring recovered on behalf of the Estate."

Powell is again mistaken. Found in Schedule C (tangible personal) of both the inventory and amended inventory, Attorney Miller clearly listed two automobiles and detailed the vehicles' makes, models, and values. Additionally, in the first administrative account, Attorney Miller apprised the Orphans' Court and Charles Wingler that the "Honda CRV [had been] sold for the appraisal value and the proceeds [had been] deposited to the Estate account." As for Powell's contention about the decedent's jewelry, the first administrative account stated that "personal property bequeathed to individuals by Ms. Wingler not appearing on the Inventory was damaged by the effects of hoarding and misuse and [is] of no value. Nevertheless, this property was distributed in accordance with Ms.

20

Wingler's Will." Importantly, Charles Wingler did not file any exceptions to this first administrative account.[8] As such, the finding of the hearing judge was not clear error in describing the amended inventory as "detailed, itemized and supported by documentation," and Powell's exception is overruled.

Next, Powell excepts to the hearing judge's finding, which Powell argues, "implies that [Attorney] Miller only learned of issues regarding the validity of the will in January 2012" even though "[Attorney] Miller testified that she had concerns about the validity of the will upon first viewing it and during the several months before the will was invalidated by the Orphan[]s' Court." Powell's contention is incorrect. The finding states that "[i]n January 2012, [Attorney] Miller received a call from the Register of Wills Office informing her that the information earlier imparted about the Will (i.e., that it was valid) was mistaken." "The information" imparted was discussed earlier in the findings when the hearing judge wrote that "[Attorney] Miller had concerns about the validity of the handwritten will" at the beginning of her representation of Wilking "but based on communications she had with an assistant Register of Wills for Carroll County on April 1, 2011, [Attorney Miller] filed the Will along with other necessary documents, and the handwritten Will was admitted for probate." Quite clearly, the findings taken together show that Attorney Miller had concerns about the validity of the will but still filed the will

---

[8] The last line of the decedent's will states "I want Meghan [Wilking, Stephanie's minor daughter] to have all of my jewelry." After Charles Wingler replaced Wilking as personal representative, Charles Wingler testified that Stephanie Wilking "turned over a small box of jewelry." The jewelry was later appraised to be worth less than $500.

based upon communication with the assistant Register of Wills. The hearing judge's finding was not clear error and Powell's exception is overruled.

Finally, Powell excepts to the hearing judge's finding that "[a]s of [October 7, 2014], [Powell] still had not filed a fee petition with the Orphans' Court." Powell argues that he did file "a fee petition with the Orphans' Court; however, the Orphan[]s' Court rejected that petition." As noted later in the hearing judge's findings though, Powell first filed "[o]n or about October 22, 2014, a Petition for Attorney Fees." The hearing judge's finding was not clear error because October 22, 2014 is a date later than October 7, 2014. As such, Powell's exception is overruled.

B. *Exceptions to the Hearing Judge's Conclusions of Law*

Bar Counsel excepts to the hearing judge's failure to find that Powell's conduct, taken as a whole, violated Rule 8.4(d). Based upon our independent review of the record as discussed below, we sustain Bar Counsel's exception as to Rule 8.4(d) and uphold the rest of the hearing judge's conclusions of law.

## Rules 1.1, 1.3, 3.3, and 3.4

Rule 1.1 requires that an attorney "provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Rule 1.3 requires that a lawyer must also "act with reasonable diligence and promptness in representing a client." Conduct which violates Rule 1.1 will often also violate Rule 1.3. *See Attorney Grievance Comm'n v. McCulloch*, 404 Md. 388, 398 (2008). The hearing judge found that "there was clear and convincing evidence that [Powell]'s representation of Charles Wingler, Personal

22

Representative of the Estate of Charlene Wingler, did not demonstrate the skill, thoroughness and preparation reasonably necessary for the representation," violating Rules 1.1 and 1.3.

Rule 3.3(a) states that an attorney must not "make a false statement of fact or law to a tribunal." Rule 3.4(c) requires that a lawyer not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."

Powell's conduct provides overwhelming evidence of wrongdoing. Powell did not file timely exceptions to the second and final accounting of the personal representative of the Estate and failed to submit a timely, complete, and accurate inventory of the Estate's assets and administrative account. For example, in the January 29, 2013 inventory, Powell failed to itemize jewelry given to him by Wilking, the previous personal representative. Powell also failed to submit a petition for personal representative's commissions and attorney fees that was acceptable to the Orphans' Court. When alerted to the fact that various legal documents were incomplete or overdue, Powell failed to correct the deficiencies and ignored multiple Orphans' Court orders. Specifically, Powell's failure to return the $40,000 he improperly took from the Estate resulted in multiple orders from the Orphans' Court. There is no evidence that Powell's refusal to honor the orders directing him to return the money to the Estate was based on an assertion that no valid obligation existed. Instead, Powell's argument was that the Orphans' Court orders were an attempt to ensure that Wilking received her $5,000 commission as personal representative of the Estate.

Powell did not provide competent representation nor did he act with reasonable diligence on behalf of Charles Wingler. Additionally, described in more detail *infra*, Powell failed to manage his attorney trust account with requisite skill and thoroughness. Also, Powell's inventory submissions failed to accurately list all Estate assets. Finally, Powell's noncompliance with the orders of the Orphans' Court was not justified. Simply because Powell disagreed with an Orphans' Court determination about a personal representative's commission does not excuse his noncompliance with a legal order. Therefore, we agree with the hearing judge that clear and convincing evidence exists to conclude that Powell's conduct violated Rules 1.1, 1.3, 3.3(a), and 3.4(c).

### Rules 1.5 and 1.7

Rule 1.5(a) requires that an attorney shall not make an agreement for, charge, or "collect an unreasonable fee." Rule 1.5(a) lists factors a court must consider when determining whether a fee was reasonable:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the attorney or attorneys performing the services; and
> (8) whether the fee is fixed or contingent.

As discussed previously, Powell billed $60,375, and disbursed $40,000 to himself, for legal services in handling an Estate with cash assets of approximately $70,000. In his exceptions, Powell asserted that "Mr. Wingler approved Mr. Powell's fees and expenses,"

24

that Powell "would always obtain Mr. Wingler's permission prior to advancing himself any fees," and that Mr. Wingler "believed that Mr. Powell earned his fees." While Charles Wingler may have agreed to these fees, we must evaluate the reasonableness of the fees in conjunction with the factors found above. Here, Powell sought fees greater than 80% of the Estate's net assets and his recovered attorney's fees account for more than half of the Estate's value. Also, due to Powell's lack of representation and competence, Charles Wingler has had judgments levied against him, individually, as personal representative, and as the sole heir of the Estate.

Additionally, Powell's fee arrangement violated Maryland Code, Estates and Trusts Article ("ET") § 7-604, which states that attorney's fees and commissions may only be made without Orphans' Court approval if all interested persons consent in writing and if the combined sum of commissions and fees do not exceed the limitations spelled out in ET §§ 7-601 and 7-602. Under ET § 7-601, the maximum fees and commissions allowed in this case without a petition to the Orphans' Court was $3,810.05.[9] As such, Charles Wingler's consent was insufficient to authorize the disbursement of commissions by Powell in the absence of Orphans' Court approval. Additionally, Powell violated ET § 7-602(b) because he retained Estate funds as attorney's fees before he filed a petition for attorney's fees with the Orphans' Court. Clear and convincing evidence supports the hearing judge's conclusion that Powell violated Rule 1.5(a). *See Attorney Grievance Comm'n v. Kendrick*, 403 Md. 505–510 (2008).

---

[9] ET § 7-601(b) allows commissions to be collected up to 9% of the first $20,000 of the Estate's net value and 3.9% of the remainder.

Generally, lawyers are not allowed to represent a client if the representation results in a conflict of interest. Rule 1.7 specifically states that a conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or *by a personal interest of the lawyer*." (Emphasis added). In the lawsuit, the circuit court found Powell and Charles Wingler jointly and severally liable for the defendants' attorney's fees and court costs. When this judgment was levied, a conflict of interest was created between Powell and Charles Wingler. As Charles Wingler and Powell were found jointly and severally liable, Powell's incentive was to lessen his liability, which would increase Charles Wingler's obligation. Additionally, there is no evidence in the record that Charles Wingler gave his informed consent to the conflict in writing or otherwise. Based upon the hearing judge's findings of fact, we conclude that there is clear and convincing evidence that Powell's conduct violated Rule 1.7.

### Rules 3.1 and 4.4

Rule 3.1 requires that an attorney not "bring or defend a proceeding, or assert or controvert an issue . . . unless there is a basis for doing so that is not frivolous." Here, even though Estate proceedings were still active in the Orphans' Court, Powell commenced a lawsuit in the circuit court. The lawsuit claimed that Wilking committed acts of misconduct in her role as personal representative. The circuit court granted the defendants' motions for summary judgment and motions for sanctions, holding Powell and Charles Wingler jointly and severally liable for the Wilking's legal fees plus costs. In its ruling, the circuit court found that Powell failed to file objections or exceptions to Wilking's June

26

7, 2011 inventory, January 3, 2012 amended inventory, or the July 20, 2014 amended inventory or to Wilking's first and second administration accounts. Because of Charles Wingler's (and Powell's) failure to file exceptions, the circuit court held that all but one issue complained of in the lawsuit were barred. For the remaining issue as to whether Charles Wingler had substantial justification for suing Wilking for breach of her fiduciary duty related to the sale of the Estate real estate, the circuit court found that the "filing of the instant lawsuit . . . was without substantial justification." The hearing judge was careful to note that he made his own findings and conclusions and did not rely on the findings of the circuit court judge who presided over the lawsuit. *See Attorney Grievance Comm'n v. Alison*, 349 Md. 623, 635 (1998). There is clear and convincing evidence that Powell's conduct violated Rule 3.1(a).

Rule 4.4(a) requires that, while representing a client, an attorney not use "means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person." As detailed previously, an Orphans' Court order stated that Wilking was entitled to $5,000 as the commission for her tenure as personal representative of the Estate. Powell believed that Wilking was not entitled to this commission even though Powell, on behalf of his client, entered into a consent order detailing the amount of Wilking's commission. In his testimony, Powell admitted that he consented to Wilking's commission because he knew that the Estate would not have enough money to pay the commission after the Estate paid the inheritance to the sole beneficiary and Powell's attorney's fees. As such, Powell acknowledged that he misled both the Orphans' Court and Wilking into believing that

27

Wilking would be compensated and that there would be remaining Estate funds to pay her commission. Powell's deceptive action has continually burdened Wilking and her efforts to receive her commission. There is clear and convincing evidence that Powell's conduct violated Rule 4.4(a).

### Rules 8.1 and 8.4

Rule 8.1(b) requires that a lawyer involved in a disciplinary matter must not "fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority . . . ." The hearing judge found that Powell "failed to provide all the documents requested by Bar Counsel during the investigation following the overdraft notice on his trust/escrow account." Specifically, Powell was asked by Investigator Miller "to provide reconciliation reports, and in response, [Powell] indicated that these reports were being maintained, but he never produced them." As such, clear and convincing evidence supports the hearing judge's conclusion that Powell violated Rule 8.1(b).

Rule 8.4(a) states that it is professional misconduct for an attorney to "violate . . . the Maryland Lawyers' Rules of Professional Conduct." The hearing judge found that because Powell has violated multiple Rules, there is clear and convincing evidence that Powell's conduct has violated Rule 8.4(a). Since we have concluded that Powell has violated multiple Rules, we agree that Powell has violated Rule 8.4(a).

A lawyer violates Rule 8.4(c) if the lawyer "engage[s] in conduct involving dishonesty, fraud, deceit or misrepresentation." The hearing judge found that Powell was

28

"dishonest" and "disingenuous" when he stated that his inability to repay was why he refused to return $40,000. As detailed by Investigator Miller, Powell was in possession of $60,000, for which Powell had no explanation, as of December 11, 2015. Powell asserted that he deposited $10,000 of his own money into the attorney trust account when it was first opened and that he allowed funds, such as reimbursements for advanced costs, to accumulate in the account, growing to approximately $70,000. Clear and convincing evidence shows that Powell could have returned funds to the Estate by disbursing personal funds that were deposited in his various trust accounts. As such, Powell's conduct violated 8.4(c).

Under Rule 8.4(d), it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." Since the hearing judge found Powell's interactions with the Orphans' Court "repeatedly dishonest, disingenuous, and not candid" and because Powell impermissibly commingled personal funds with his attorney trusts accounts over a long period of time, Bar Counsel argues that Powell's conduct violated Rule 8.4(d). "Generally, a lawyer violates MLRPC 8.4(d) where the lawyer's conduct . . . would negatively impact the perception of the legal profession of a reasonable member of the public[.]" *Attorney Grievance Comm'n v. Marcalus*, 442 Md. 197, 205 (2015). A reasonable person's perception of the legal profession would be negatively affected by learning that Powell, a lawyer, engaged in "dishonest" and "disingenuous" behavior with a tribunal and mixed client funds with personal assets. As such, we sustain Bar Counsel's exception and conclude that Powell's conduct violated Rule 8.4(d).

**Rule 1.15 and Maryland Rules 19-407, 19-408, and 19-410**

29

Maryland Rule 19-407 states:

**(a) Creation of Records.** The following records shall be created and maintained for the receipt and disbursement of funds of clients or of third persons:

(2) *Deposits and Disbursements.* A record for each account that chronologically shows all deposits and disbursements, as follows:

(A) for each deposit, a record made at or near the time of the deposit that shows (i) the date of the deposit, (ii) the amount, (iii) the identity of the client or third person for whom the funds were deposited, and (iv) the purpose of the deposit;

(B) for each disbursement, including a disbursement made by electronic transfer, a record made at or near the time of disbursement that shows (i) the date of the disbursement, (ii) the amount, (iii) the payee, (iv) the identity of the client or third person for whom the disbursement was made (if not the payee), and (v) the purpose of the disbursement;

(C) for each disbursement made by electronic transfer, a written memorandum authorizing the transaction and identifying the attorney responsible for the transaction.

(3) *Client Matter Records.* A record for each client matter in which the attorney receives funds in trust, as follows:

(A) for each attorney trust account transaction, a record that shows (i) the date of the deposit or disbursement; (ii) the amount of the deposit or disbursement; (iii) the purpose for which the funds are intended; (iv) for a disbursement, the payee and the check number or other payment identification; and (v) the balance of funds remaining in the account in connection with the matter; and

(B) an identification of the person to whom the unused portion of a fee or expense deposit is to be returned whenever it is to be returned to a person other than the client.

(4) *Record of Funds of the Attorney.* A record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 19-408(b).

Powell did not retain and maintain complete and accurate records of both his personal money held in the trust accounts or the identity of all deposited client funds. Powell also did not maintain reconciliation reports or refused to produce them to Bar Counsel. For

30

these reasons, clear and convincing evidence exists to conclude that Powell's conduct violated Maryland Rule 19-407.

Maryland Rule 19-408 requires that:

**(a) General Prohibition.** An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 19-404 or permitted to be so deposited by section (b) of this Rule.
**(b) Exceptions.**
(1) An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 19-411(b)(1)(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.
(2) An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.
(3) Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

Rule 1.15(a) requires that attorney "hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property," that "[f]unds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter," and that "[c]omplete records of the account

funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created."

Powell disbursed attorney's fees to himself before the Orphans' Court granted his petition for attorney's fees. Powell deposited and maintained personal funds in his trust account well in excess of the amount needed for fees to maintain the account and failed to promptly withdraw funds to which he was entitled. *See Attorney Grievance Comm'n v. Smith*, 457 Md. 159, 200 (2015) (holding that an attorney's use of a trust account for personal expenses and allowing the account to fall out of balance violated Rule 1.15(a)). While it may have been Powell's established tradition to leave fees earned in his trust account, Powell also admitted to allowing his trust account to be used to avoid Internal Revenue Service detection. For these reasons, we conclude that there is clear and convincing evidence that Powell violated Rule 1.15(a) and Maryland Rule 19-408.

Maryland Rule 19-410 holds that:

**(a) Generally.** An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose.
**(b) No Cash Disbursements.** An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer, and no cash withdrawal may be made from an automated teller machine or by any other method. All disbursements from an attorney trust account shall be made by check or electronic transfer.
**(c) Negative Balance Prohibited.** No funds from an attorney trust account shall be disbursed if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate.

Powell used Estate funds to pay himself attorney's fees when neither he nor his client was authorized to decide or allow this to occur. Additionally, Powell made cash disbursements

and disbursed funds from his attorney trust account which created a negative balance. For these reasons, we conclude, as the hearing judge did, that Powell's conduct violated Maryland Rule 19-410.

## SANCTION

As we have often stated, the purpose of attorney disciplinary proceedings is to protect the public and deter other lawyers from engaging in misconduct rather than simply to punish the lawyer. *Attorney Grievance Comm'n v. Mollock*, 450 Md. 133, 158 (2016). The public is protected when sanctions are "commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Pennington*, 387 Md. 565, 596 (2005) (citing *Attorney Grievance Comm'n v. Ellison*, 384 Md. 688, 714 (2005)). This Court has established standards to weigh the severity of an attorney's misconduct.[10]

---

[10] In determining an appropriate sanction for a lawyer's misconduct, this Court considers:

(1) the MLRPC that the lawyer violated; (2) the lawyer's mental state; (3) the injury that the lawyer's misconduct caused or could have caused; and (4) aggravating factors and/or mitigating factors.

Aggravating factors include: (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the MLRPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

Bar Counsel recommended that we disbar Powell for his multiple violations of the Rules. *See Attorney Grievance Comm'n v. Levin*, 438 Md. 211, 231 (2014) (holding that when an attorney engages in intentionally dishonest conduct, disbarment will follow as a matter of course absent compelling extenuating circumstances that justify a lesser sanction). Additionally, Bar Counsel asserted that Powell's conduct cannot be considered "an isolated incident" because he had been sanctioned twice previously and his misconduct in this case began in 2012.

Powell requested a public reprimand. In support, Powell stated that he was "forthright" in describing to Bar Counsel his "practice for maintaining [escrow] accounts since he began his practice in 1971." Powell explained that he "would advance funds for such purposes as the payment of court fees, and would keep reimbursements for those

---

Mitigating factors include: (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to Bar Counsel or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the MLRPC; and (14) unlikelihood of repetition of the misconduct.

*Attorney Grievance Comm'n v. Allenbaugh*, 450 Md. 250, 277–78 (2016) (cleaned up).

advanced funds in his escrow account," allowing him "to provide his client with settlement funds several days earlier than they would otherwise receive payments."

The hearing judge did not note any aggravating or mitigating factors. Bar Counsel requested that we consider Powell's prior history of disciplinary actions. On June 19, 2008, in an action unrelated to the instant matter, Powell received a reprimand for the wrongful disbursement of funds from his escrow account. On May 16, 2013, we reprimanded Powell, by consent, "for preparing an instrument giving himself a substantial gift from his client, who was not related to him and was not represented by independent counsel in connection with the gift, and by assisting a client in conveying real property in contravention of a court order." *Attorney Grievance Comm'n v. Powell*, 431 Md. 442 (2013). Additionally, Bar Counsel noted that Powell did not cooperate with its investigation and refused to acknowledge the wrongful nature of his conduct in spite of having substantial experience in the practice of law. Lastly, Bar Counsel asserted that there was a high likelihood of repeat misconduct due to his previous misconduct. In response, Powell stated that any sanction "should take into account [his] lengthy career and his record of public service, while also serving as a deterrent to other attorneys."

During oral argument, Powell's counsel argued that Powell is a "victim of circumstances." This characterization does not comport with the facts of this case. In this matter, Powell brought a frivolous lawsuit, failed to file timely or complete documents with the Orphans' Court, made misrepresentations to the Orphans' Court and Bar Counsel, and repeatedly disobeyed Orphans' Court orders, including an order to return attorney's fees. Additionally, Powell has previously received two reprimands for substantially the same

35

misconduct found in this matter, including mismanagement of escrow accounts.  Although we acknowledged Powell's civic and volunteer contributions, a reprimand or suspension would not be sufficient protect the public or serve as a deterrent to other attorneys.

For the reasons set forth in this opinion, we issued a *per curiam* order disbarring Powell on June 1, 2018.